IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Kimberly N. Chapman, | ) | Civil Action No. 6:12-2099-JMC-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for supplemental security income ("SSI") benefits on June 26, 2008, with a protective filing date of April 18, 2008 (Tr. 10, 200-206), alleging that she became unable to work on January 1, 1997.[3] The application was denied

---

[1]Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

[3]A claimant for SSI cannot be paid for any months before the month in which she filed an application, nor for the month in which the application was filed. 20 C.F.R. § 416.335. The regulations provide that the Social Security Administration will develop the claimant's complete

initially and on reconsideration by the Social Security Administration. On April 29, 2009, the plaintiff requested a hearing, and a hearing was held on January 13, 2010, at which the plaintiff, her legal counsel, and vocational expert Carol Crawford appeared (Tr. 93-125). A supplemental hearing was held on August 31, 2010, at which the plaintiff, her legal counsel, medical expert Dr. Neil Aronov, and vocational expert Carey A. Washington appeared (Tr. 36-67). The administrative law judge ("ALJ") considered the case *de novo*, and on October 25, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on July 10, 2012. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant has not engaged in substantial gainful activity since April 18, 2008, the application date (20 C.F.R. § 416.971 *et seq*.).
>
> (2)    The claimant has the following severe impairments: borderline intellectual functioning, insulin-dependent diabetes mellitus, obesity, personality disorder, depression, and degenerative disc disease of the lumbar and thoracic spine (20 C.F.R. § 416.920(c)).
>
> (3)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).
>
> (4)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of medium work as defined in 20 C.F.R. §

---

medical history for at least the 12 months preceding the month in which the claimant filed her application, unless there is a reason to believe that development of an earlier period is necessary or unless the claimant says her disability began less than 12 months before the application was filed. *Id.* § 416.912(d). Here, the ALJ considered the plaintiff's "complete medical history" (Tr. 10) citing evidence from June 1998 to 2010 (Tr. 13-30).

416.967(c). Specifically, I find that she can frequently lift 25 pounds and occasionally lift 50 pounds. I also find that she can stand, sit or walk for 6 hours out of an 8-hour workday, respectively. I further find that she should avoid concentrated exposure to fumes. Finally, I find that she can perform simple, one to two-step functions, and she should not have contact with the public.

(5)    The claimant has no past relevant work (20 C.F.R. § 416.965).

(6)    The claimant was born on November 27, 1968, and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. § 416.963).

(7)    The claimant has a limited education and is able to communicate in English (20 C.F.R. § 416.964).

(8)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968).

(9)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 416.969 and 416.969(a))..

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since April 18, 2008, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

3

impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

4

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff has a twelfth grade special education (Tr. 231). Academic records indicated that the plaintiff earned passing grades in the 1983-84 ninth grade school year; passing to poor grades in the 1984-85 tenth grade school year; passing to poor grades in the 1985-86 eleventh grade school year; and passing to poor grades in the 1986-87 twelfth grade school year (Tr. 220). She reported no past relevant work experience. The plaintiff was 41 years of age as of the date of the Commissioner's final decision (Tr. 200).

5

On July 8, 1998, the plaintiff was seen for a psychological assessment by Christy Giesber, M.S., of the South Carolina Vocational Rehabilitation Department. Administration of the Wechsler Adult Intelligence Scale - Revised ("WAIS-R") revealed the plaintiff had a Full Scale Intelligence Quotient ("IQ") of 61, which placed her in the mentally retarded range of intellectual ability.  Her Verbal IQ was 63, and her Performance IQ was 63 (Tr. 519-20).

Administration of the WAIS-R by Spurgeon N. Cole, Ph.D., a consultative psychologist, in October 1998, revealed the plaintiff had a Full Scale IQ of 71, a Verbal IQ of 71, and a Performance IQ of 72, all indicating borderline cognitive ability (Tr. 512-13). Dr. Cole noted that the plaintiff demonstrated poor, inconsistent effort on testing and that she was capable of functioning at a slightly higher level.  He also noted that the plaintiff demonstrated a good understanding of the nature and purpose of the evaluation, the ability to concentrate satisfactorily throughout the evaluation, and satisfactory hygiene.  He further noted that the plaintiff reported holding one job for a year and a half.  She lost the job when a friend failed to call in notice of an absence from work for her, and she quit another job due to automobile mechanical difficulty.  Additionally, he noted that the plaintiff initiated and participated in normal daily living activities, including performing household chores, shopping, handling money, visiting with others, talking on the telephone, dining out occasionally, and engaging in crafts, and that she reported enjoying being around people. Dr. Cole stated that the plaintiff was probably functionally illiterate, but she could perform satisfactorily in math.  He further stated that the plaintiff's major limitation was her childlike dependent personality trait.  His diagnostic impression was borderline cognitive ability and personality disorder (NOS)  (Tr. 511-13).

In a statement dated in October 1998, a social worker reported that the plaintiff declined "Disability and Special Needs" social services because she was not

6

mentally retarded or disabled, and she did not belong with mentally retarded people (Tr. 514).

On examination in December 2002, Dr. Cole noted that the plaintiff watched television, listened to music, shopped, dined out, talked on the telephone, went out with others, and attended a local community holiday function (Tr. 386). He noted that the plaintiff's effort was "rather poor," and he did not think the plaintiff had any intention of working (Tr. 387). Dr. Cole noted there had been "very little change" since the last time he saw the plaintiff (Tr. 384).

Records of Rosa Clark Medical Center between April 8, 2008, and August 17, 2010, revealed, among other diagnoses and treatments, treatment with medication for diabetes mellitus and a related shoulder sore; treatment with medication for depression, stress, and "nerves"; treatment with medication for back pain; and assessment of obesity (Tr. 582-88, 626-34, 647-49, 735-47). During this period, examinations revealed neck muscle tenderness; normal respiratory functioning, including clear chest/lungs (Tr. 582, 585-86, 588, 630, 632, 647, 649, 742-44); normal cardiac functioning, including regular cardiac rate and rhythm (Tr. 582, 586, 588. 630, 632, 647, 649, 742-43); present finger and toe sensation; the absence of extremity ulcers, rash, or foot wounds; and the absence of extremity edema (Tr. 582, 586, 632, 649, 742-43). Lumbar spine x-rays revealed nonspecific bowel gas pattern, mild scoliosis, Grade 1 Spondylolisthesis, and mild facet joint degenerative changes at L4-L5 and L5-S1. Thoracic spine x-rays revealed minimal scoliosis and mild degenerative changes (Tr. 644).

Dr. Cole examined the plaintiff again on September 26, 2008. The plaintiff reported that she obtained a high school completion certificate. She also reported that she managed her own personal finances, possessed a driver's license but did not currently drive an automobile, and used public transportation without difficulty, knew the routes, and liked to travel around areas, but that she could not read or spell. She further reported that

7

she cared for her own personal needs, took 14 medications independently, and maintained a relationship with a significant other with whom she resided intermittently (Tr. 600-03).

Examination revealed that the plaintiff was loud, socially and emotionally immature, and sometimes behaviorally inappropriate, and demonstrated moderately impaired concentration and easy distraction (Tr. 600-602). Examination also revealed that the plaintiff was alert and oriented and demonstrated a satisfactory range of affect; relevant, coherent, understandable speech; the abilities to give meaningful family and medical history and to carry on a meaningful conversation; logical, goal-directed thought processes; satisfactory memory; adequate focus for evaluation; a good understanding of the nature and purpose of testing; the ability to perform simple mathematical calculations; and the ability to count backwards from 20 to one (Tr. 600-02).

Dr. Cole noted that some information the plaintiff offered was obviously exaggerated, such as stating she had not slept in over three weeks, although she did not appear sleep deprived. He also noted that the plaintiff reported being homeless but did not appear homeless, with satisfactory hygiene, a new handbag, and multiple rings in her ears and on her fingers (Tr. 600, 602). He further noted that the plaintiff received food stamps and had applied for housing assistance and knew how to use "the system," had good "street smarts," and had a lot of friends and knew how to use friends effectively (Tr. 600, 602).

Dr. Cole diagnosed borderline cognitive ability, personality disorder, and possible depression and anxiety. He concluded that the plaintiff had limited but adequate social and communication skills, that her vocabulary use and speech patterns suggested borderline cognitive ability, but that the plaintiff demonstrated no evidence of loss of cognitive functioning since previous evaluations (Tr. 600-602). He indicated that the plaintiff was capable of learning simple tasks, focusing her attention well enough to

complete a task in a timely manner, and performing work that did not require working directly with the public (Tr. 602).

On September 30, 2008, Larry Clanton, Ph.D., a State agency psychologist, determined that, based upon summary conclusions derived from the evidence in the file, the plaintiff could remember location and work-like procedures; carry out short, simple instructions and perform simple, routine work activities; complete tasks in a timely manner; sustain appropriate interactions with peers and co-workers; and respond appropriately to changes in a routine setting (Tr. 620).

On October 19, 2009, the plaintiff sought treatment at Oconee Medical Center, Seneca, South Carolina, complaining of nasal congestion.  Examination revealed clear lungs and normal respiratory effort.  A healthcare provider diagnosed viral upper respiratory infection and treated the plaintiff with medication (Tr. 659-60).

Between September 21, and November 20, 2009, the plaintiff underwent wound therapy for a right shoulder ulcer at Oconee Medical and was discharged with a healed wound (Tr. 655-58).

On March 17, 2010, the plaintiff sought treatment at Oconee Medical for complaints of a cough and a vaginal discharge (Tr. 717-24).  Examination revealed that the plaintiff was alert, oriented, and calm, and demonstrated normal motor strength, clear lungs, and normal respiratory effort (Tr. 719-22).  Providers diagnosed pelvic inflammatory disease and upper respiratory infection (Tr. 719-21).

On March 20, 2010, the plaintiff sought treatment at Oconee Medical for shortness of breath (Tr. 725-31).  Examination revealed that the plaintiff was alert, and oriented.  She demonstrated normal speech, normal respiratory effort and the absence of respiratory distress, and a steady gait (Tr. 719, 721, 726, 730).  Providers diagnosed bronchitis, treated the plaintiff with medication, and she was discharged in improved condition (Tr. 727-30).

9

Brian Keith, Ph.D., a consultative licensed counseling psychologist, examined the plaintiff on March 29, 2010.  The plaintiff reported that she had a twelfth grade special education and that she experienced anxiety and depression for which she received no counseling or therapy.  She also reported that she cared for personal needs independently, was able to wash dishes and launder clothes, spent her days riding the bus, possessed a driver's license, and shopped occasionally.   The plaintiff also stated that she had maintained a relationship with a significant other for seven years.  She further reported that she seldom talked on the telephone but she had a cell telephone (Tr. 661-65).

Examination revealed a restricted affect and a reported "not good" mood, but also that the plaintiff was alert, oriented, attentive, coherent, and easily refocused, and demonstrated a neat appearance, with multiple earrings, appropriate eye contact, normal psychomotor functioning, and clear speech (Tr. 662).  Results of administration of the WAIS-IV revealed a Full Scale IQ of 60; a Verbal Comprehension Index ("VCI") (formally referred to as Verbal IQ) of 61; and a Perceptual Reasoning Index ("PRI") (formerly referred to as Performance IQ) of 69; and a Working Memory Index of 58 (Tr. 663-65).

Dr. Keith noted that the plaintiff was able to successfully navigate the community environment (Tr. 665).  He diagnosed depression, mild mental retardation, and physical disorders by report, and he concluded that overall the plaintiff's cognitive functioning was within the mildly mentally disabled range and that she could benefit from mental health treatment and job training (Tr. 664-65).  Dr. Keith indicated that the plaintiff had mild to moderate mental functional limitations, including mild limitations in understanding, remembering, and carrying out simple instructions, making simple work-related decisions, interacting appropriately with the public, supervisors, and co-workers, and responding appropriately to usual work situations and to changes in a routine work setting, and a limitation to work allowing close supervision, and that the plaintiff would be able to complete simple tasks and follow simple directions (Tr. 665-67).

10

David N. Holt, M.D., a consultative physician, examined the plaintiff on June 10, 2010 (Tr. 671-79). The plaintiff reported a history of, among other disorders and complaints, back pain she could not quantify as to severity and for which she took oral medication; diabetes mellitus without significant complications with the exception of a shoulder sore and leg pain she related to such disorder, for which she took oral and injected medication; and depression and anxiety. The plaintiff reported that she cared for her personal needs without difficulty, was able to perform "all manner of" household chores, possessed a driver's license but did not drive because she did not have an automobile, and walked for transportation up to two miles daily (Tr. 671, 673, 675).

Examination revealed that the plaintiff was oriented and demonstrated normal grooming and hygiene. She could follow directions adequately, count backwards from 20 quickly, spell "world" backwards, and name the current and last U.S. president. Examination also revealed obesity, 75% understandable speech, slightly reduced lumbar spine flexion, slight extremity muscle weakness throughout, decreased grip strength bilaterally, normal motor examination, normal hand, elbow, wrist, knee, hip, and ankle ranges of motion, normal sensory examination, negative straight leg raise testing, an essentially normal gait, normal station, the ability to squat normally, and the ability to mount/dismount the examination table and undress/dress without difficulty (Tr. 674-75, 678-79). Lumbar spine x-rays revealed "very minimal degenerative disc disease changes" (Tr. 669). Dr. Holt diagnosed, *inter alia*, diabetes mellitus under reasonably good control, obesity, probable lumbar spine degenerative disease, as well as depression and anxiety (Tr. 675).

On July 7, 2010, Dale Van Slooten, M.D., a State agency physician, concluded that the plaintiff retained the physical residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday; push/pull within her lifting capacity; and handle and

11

finger frequently; and that she had no postural, visual, communicative, environmental, or other manipulative limitations (Tr. 706-709).

On July 7, 2010, Debra C. Price, Ph.D., a State agency psychologist, determined that, based upon summary conclusions derived from the evidence in the file, the plaintiff could understand and remember simple instructions; carry out simple tasks for two hours at a time without special supervision; relate appropriately to co-workers and supervisors; and adapt to workplace changes. Dr. Price further opined that the plaintiff would be best suited for a work environment with limited public contact (Tr. 713-15).

In a statement dated August 7, 2008, the plaintiff reported that she cared for her personal needs with difficulty in dressing, walked for transportation and used public transportation, drove an automobile, and shopped. She also reported that she did not require special reminders to care for personal needs or to go places, that she could go out alone and pay attention "a lot" and finish what she started, e.g., a conversation, chores, reading, watching a movie. The plaintiff stated that she could not walk or stand for a long period of time and she could not lift anything over ten pounds (Tr. 235-39).

In a statement dated August 7, 2008, the plaintiff's mother reported that the plaintiff walked for transportation and used public transportation, drove an automobile, and shopped. She also reported that the plaintiff did not require special reminders to care for personal needs, to take medication, or to go places; that she could go out alone and pay attention "a lot" and finish what she started, e.g., a conversation, chores, reading, watching a movie. She further stated that the plaintiff's condition did not affect her abilities to squat, reach, sit, kneel, stair climb, complete tasks, concentrate, follow instructions, or get along with others. The plaintiff's mother opined that the plaintiff could not lift anything over ten pounds (Tr. 252-55).

At her hearing on January 13, 2010, the plaintiff testified that she resided transiently with friends and at times in a motel with a significant other for privacy, because

12

he lived with his mother (Tr. 101-103, 114). She also testified that she was a "slow learner" and had received a twelfth grade special education. She was able to perform minimal reading and addition, and at times make change and manage her own funds if she had a calculator (Tr. 99, 105, 107). The plaintiff testified that she had a driver's license but did not drive because she did not have an automobile (Tr. 113). She further testified that she had depression and difficulty with stress and interaction with others (Tr. 105, 112-13, 117-18). She additionally testified that she had diabetes mellitus and extremity pain and numbness for which she took oral and injected medications regularly and independently, and monitored her blood glucose levels, which were controlled. She also testified that she had back pain for which she took medication (Tr. 108-112, 120).

The plaintiff stated that she dressed independently with difficulty, washed dishes and laundered clothes, used public transportation and navigated the bus line without difficulty, shopped occasionally, and attended church services. The plaintiff stated that she had gotten meals at a "soup kitchen" for ten years (Tr. 104-105, 115, 119). She also stated that she had in the past operated a computer (Tr. 113, 118-19).

At the hearing on August 31, 2010, the plaintiff testified that she continued to have extremity symptoms and that she continued to reside transiently with friends and family. The plaintiff further testified that she used public transportation to attend medical appointments and to shop. She testified that her condition was the same as during her previous hearing (Tr. 54-56).

Neil E. Aronov, Ph.D., a medical expert, testified that the record indicated evidence of borderline intellectual functioning. He indicated that the IQ scores the plaintiff achieved on testing by Dr. Keith did not appear consistent with the plaintiff's adaptive functioning, including riding a bus without problems, making change, making friends, giving herself injections and monitoring her blood glucose levels, performing household chores,

and using a computer (Tr. 43- 44).  He further testified that the plaintiff's history of a special education did not necessarily establish a deficit in adaptive functioning (Tr. 47).

Vocational expert Carey Washington, Ph.D., testified that considering an individual of the plaintiff's age, educational background, and past work experience, with a residual functional capacity to lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk and sit six hours in an eight-hour day; and perform work not requiring any public contact, concentrated exposure to fumes, or more than simple, one to two-step functions, jobs existed in the regional and national economies such an individual could perform.  He cited the unskilled medium[4] occupations of hand packager, park worker, and sandwich maker as examples and provided the incidence of these jobs in the regional and national economies (Tr. 59-61, 65).

## **ANALYSIS**

The plaintiff argues that the Commissioner's finding that she does not have sufficient deficits in adaptive functioning to satisfy the requirements of Listing 12.05(C) (Mental Retardation) is not supported by substantial evidence.  The plaintiff further argues that this error lies in the ALJ's selective examination of the evidence and asks for remand for an award of benefits.

The regulations state that when a claimant shows that her impairment(s) meet or equal a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §§ 404.1520(d), 416.920(d).  To show that an impairment is "equivalent to a listed impairment, [a claimant] must present medical findings equal in severity to *all* the criteria for the one most similar

---

[4]Medium work involves sitting two hours and walking and standing six hours in an eight hour workday and lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. *See* 20 C.F.R. § 416.967(c) (2012); SSR 83-10, 1983 WL 31251, at *6.

14

listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (citation and internal quotation marks omitted) (emphasis in original).

Listing 12.05 provides as follows:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

15

4. Repeated episodes of decompensation, each
of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05.

As set forth above, to meet the diagnostic description or "capsule definition" of mental retardation, an individual must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [i.e., onset before age 22]." *Id*.  "If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria [paragraphs A through D], we will find that [the] impairment meets the listing." *Id.* § 12.00(A).

Here, the plaintiff argues that she meets the requirements of § 12.05(C).  The ALJ specifically considered this listing and provided an extensive analysis of his reasons for finding the plaintiff did not meet the listing (Tr. 19-22).  The ALJ noted in his decision (Tr. 19) that the plaintiff had been diagnosed with mild mental retardation after obtaining IQ scores of 70 or less on tests administered by Ms. Giesber (*see* Tr. 519-20) in 1998 and Dr. Keith (*see* Tr. 661-65) in 2010.  However, the ALJ further noted (Tr. 19) that the plaintiff was able to achieve higher scores on intelligence testing by Dr. Cole in 1998, i.e., a Full Scale IQ of 71, a Verbal IQ of 71, and a Performance IQ of 72, indicating borderline cognitive ability rather than mild mental retardation.  Additionally, Dr. Cole noted that the plaintiff demonstrated poor, inconsistent effort on testing and was capable of functioning at a slightly higher level (Tr. 511-13).  Similarly, Dr. Aronov testified that the plaintiff's IQ scores as found by Dr. Keith did not appear consistent with her adaptive functioning, including riding a bus without problems, making change, making friends, giving herself injections and monitoring her blood glucose levels, performing household chores, and using a computer (Tr. 43-44).  Furthermore, the ALJ noted (Tr. 19) that Ms. Giesber did not address the plaintiff's adaptive functioning abilities, and, after documenting the plaintiff's IQ scores in the mild mental retardation range, Dr. Keith opined that the plaintiff had only

16

mild to moderate restrictions in her ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions (*see* Tr. 519-20, 666-68).

The ALJ found that although the record contained evidence of a Verbal, Performance, or Full Scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function, the plaintiff did not have the deficits in adaptive functioning required by the capsule definition (Tr. 20). The Administration "has never adopted a standard of measurement for the term 'deficits in adaptive functioning' in the capsule definition of Listing 12.05." *Wall v. Astrue*, 561 F.3d 1048, 1073-74 (10th Cir.2009) (Holloway, C.J., dissenting). The Administration has noted, however, that the definition of mental retardation in the listings is "consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations." *Technical Revisions to Medical Criteria for Determinations of Disability*, 67 Fed.Reg. 20,018–01, at 20,022 (Apr. 24, 2002). The American Psychiatric Association has stated as follows:

> Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation. Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.

American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 42 (4th ed. Text Revision 2000) ("DSM-IV-TR"). The DSM-IV-TR further provides:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills,

17

work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years. (Criterion C).

*Id.* at 41.

While the plaintiff acknowledges that the ALJ's analysis was thorough (pl. brief at 7), she argues that the ALJ's examination of the evidence was selective and that contrary evidence existed. However, as noted by the Commissioner, the ALJ need only show that there is some evidence tending to support an ALJ's decision. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); 42 U.S.C. § 405(g). The court does not reweigh conflicting evidence or substitute its judgement for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). While some contradictory evidence may be found in the record in this case, it was the ALJ's duty to review the evidence and make findings of fact and conclusions of law. *See* 20 C.F.R. § 416.927(e)(2).

Here, the ALJ went through each of the eleven skill areas and discussed his findings as to each. With respect to adaptive functioning in the area of communication, the ALJ noted in his decision (Tr. 20-21) that Dr. Cole stated the plaintiff talked on the telephone (Tr. 512), had adequate communication skills (Tr. 600), and the ability to carry on a meaningful conversation (Tr. 600). The ALJ also noted that the plaintiff was able to testify and respond appropriately to questions asked at the hearing (Tr. 21, 36-67, 93-125). See *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) ( "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."). As argued by the Commissioner, the plaintiff's reliance upon speech difficulty is contradicted by evidence of impaired but relevant, coherent, understandable speech (Tr. 601, 662, 674, 730). Further, the plaintiff's objection to Dr. Cole's assessment of "adequate" communication as vague, is misplaced. Dr. Cole did not merely find "adequate" communication, but rather, clarified

18

that the plaintiff was able to give meaningful family and medical history and to carry on a meaningful conversation (Tr. 600-601).

With respect to adaptive functioning in the areas of self care and home living, the ALJ noted in his decision (Tr. 21) that the plaintiff had no significant problems in grooming or other independent living skills.  In making this finding, the ALJ specifically noted Dr. Cole's October 1998 reports of adequate personal hygiene (Tr. 511), the plaintiff's ability to perform household chores (Tr. 512), Dr. Holt's June 2010 report of the plaintiff's ability to perform "all manner" household chores (Tr. 673), and the plaintiff's own testimony that she administered her own medical treatment, which included taking oral and injected medications regularly and independently monitoring her blood glucose levels (Tr. 108-109). Also, Dr. Aronov testified at the hearing that the plaintiff's adaptive functioning, including her ability to give herself injections, was inconsistent with results of intelligence testing by Dr. Keith (Tr. 43-44).  The plaintiff's objection to Dr. Cole's assessment of "adequate" hygiene as vague, is misplaced.  Dr. Cole did not merely find "adequate" hygiene, but rather, clarified that the plaintiff did not appear homeless as reported, with satisfactory hygiene, a new handbag, and multiple rings in her ears and on her fingers (Tr. 600, 602).

With respect to adaptive functioning in the area of social skills, the ALJ noted in his decision (Tr. 21) that the plaintiff was able to interact with others without significant limitation. In making this finding, the ALJ specifically noted Dr. Cole's October 1998 report that the plaintiff enjoyed being around people (Tr. 512) and Dr. Cole's December 2002 report that the plaintiff shopped, dined out, talked on the telephone, went out with others, and attended a local community holiday function (Tr. 386).    As argued by the Commissioner, the plaintiff's reliance upon Dr. Holt's initial observation of the plaintiff's social skills as poor misconstrues Dr. Holt's assessment in this regard. Dr. Holt, in fact, expressly noted that the plaintiff responded immediately to gentle interaction and explained that she was emotional in a part due to family difficulty and dissatisfaction with her medical

19

provider (Tr. 675).   The plaintiff's objection to the ALJ's failure to attribute any of her difficulties in social functioning to her borderline intellectual functioning is without merit. Dr. Aronov testified that the plaintiff's adaptive functioning, including her ability to make friends, was inconsistent with results of intelligence testing by Dr. Keith (Tr. 43-44). Further, Dr. Cole noted that the plaintiff had lots of friends and knew how to use friends effectively (Tr. 600, 602).

With respect to adaptive functioning in the area of use of community resources, the ALJ noted in his decision (Tr. 21) that the plaintiff was able to navigate community resources. In making this finding, the ALJ specifically noted Dr. Cole's September 2008 report that the plaintiff used public transportation without difficulty and knew the routes (Tr. 600, 602) and that the plaintiff successfully pursued regular treatment at Rosa Clark Medical Center (Tr. 582-88, 626-34, 647-49, 735-47). Indeed, as discussed above, the plaintiff testified that she managed her diabetic treatment without difficulty (Tr. 108-10). Moreover, Dr. Keith similarly noted that the plaintiff was able to successfully navigate the community environment (Tr. 665), Dr. Cole noted that the plaintiff received food stamps and had applied for housing assistance and knew how to use "the system" (Tr. 602), and Dr. Aronov testified that the plaintiff's adaptive functioning, including her ability to utilize a bus without problems, was inconsistent with results of intelligence testing by Dr. Keith (Tr. 43-44).

With respect to adaptive functioning in the area of self direction, the ALJ noted in his decision (Tr. 21) that the plaintiff was able to complete simple day-to-day tasks without guidance. In making this finding, the ALJ specifically noted that the plaintiff attended a soup kitchen for many years (Tr. 104-105) and engaged in multiple other independently initiated daily activities, discussed more fully below, but which included caring for her own personal needs and medical treatment (Tr. 602, 661, 665), performing household chores (Tr. 512, 661), and shopping (Tr. 512, 661). Moreover, the plaintiff maintained a relationship

with a significant other with whom she resided intermittently in a motel for privacy (Tr. 101-103, 114, 600, 602, 661). The plaintiff relies on a statement in a 1997 vocational rehabilitation assessment that the plaintiff "may not possess the skills necessary to work through her problems independently" (Tr. 522).  As argued by the Commissioner, this statement was that of a nonphysician mental health provider who was referring to the plaintiff's situational depression related to the recent death of her infant, rather than her ability to work, and the provider noted that counseling might be effective (Tr. 522).

With respect to adaptive functioning in the area of functional academic skills, the fact that the plaintiff was in special education classes does not in itself establish her actual limitations or abilities. 20 C.F.R. § 416.924a(b)(7)(iv). As Dr. Aronov testified, the plaintiff's history of a special education did not necessarily establish a deficit in adaptive functioning (Tr. 47). Further, while the plaintiff argues that the ALJ did not mention her level of literacy, the ALJ noted in his decision (Tr. 21) that the plaintiff demonstrated the ability to independently complete a report of her functioning to the Commissioner (Tr. 234-41). The plaintiff possessed a driver's license without any indication of special accommodation in obtaining such and after taking driver's education in high school (Tr. 113, 600, 661, 673). The ALJ also expressly noted findings of logical, goal directed thought processes (Tr. 601), the ability to learn simple tasks (Tr. 602), and good "street smarts" (Tr. 602), which in this case included knowing and understanding the local public transportation system she used, including routes (Tr. 600, 602). The ALJ further noted that the plaintiff demonstrated the ability to add 4 + 5 and multiply 6 x 25 (Tr. 602), the ability to count backwards from 20 to one quickly (Tr. 601, 675), the ability to spell "world" backwards (Tr. 675), and the ability to name the current and last U.S. president (Tr. 675).  As argued by the Commissioner, these are routine tests of cognition and concentration. Furthermore, Dr. Cole noted that the plaintiff had a good understanding of the nature and purpose of evaluation and testing (Tr. 511, 600).

With respect to adaptive functioning in the area of work, the ALJ noted in his decision (Tr. 21, 25) that the plaintiff did not maintain that she quit or was fired from previous work due to mental inability to perform the jobs. Indeed, the plaintiff held one job for a year and a half and lost the job only when a friend failed to call in a notice of an absence from work for her (Tr. 512, 601). Also, she quit one job due to automobile mechanical difficulty (Tr. 512) and another job due to low pay (Tr. 601). The plaintiff's reliance upon Dr. Keith's statement that she would need close supervision simply does not equate to a finding of a need for a sheltered work environment. In practical terms, "an individual has a substantial loss of ability to perform a basic mental activity when he or she cannot perform the particular activity in regular, competitive employment but, at best, could do so only in a sheltered work setting where special considerations and attention are provided." *See* Program Operations Manual System DI 25020.010, https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010. The plaintiff relies upon 1997 vocational rehabilitation assessments in support of her argument that she is significantly limited in this skill area. As argued by the Commissioner, the assessments indicated that the plaintiff was very emotional and was receiving therapy for depression related to the recent death of her infant (Tr. 528). Further, the opinion that the plaintiff's job readiness was "questionable, based on her mental and limited state" was equivocal (Tr. 526).

With respect to adaptive functioning in the area of leisure activities, the ALJ noted in his decision (Tr. 22) that the plaintiff enjoyed being around people (Tr. 512), liked taking public transportation to travel around areas (Tr. 602), watched television (Tr. 386), listened to music (Tr. 386), and attended a local community holiday function (Tr. 386). Moreover, she engaged in crafts (Tr. 512) and, as discussed above, maintained a long-term relationship with a significant other.

With respect to adaptive functioning in the area of health, the ALJ noted in his decision (Tr. 22) that the plaintiff knew the appropriate steps to take to seek medical

22

attention, made regular visits to her health provider, was able to communicate her symptoms well (Tr. 582-88, 626-34, 647-49, 735-47), understood her diagnoses (medical instructions) (Tr. 722, 727), and testified that she managed her own treatment, which included, as discussed above, managing her diabetic treatment without difficulty (Tr. 108-110).

With respect to adaptive functioning in the area of safety, the ALJ noted in his decision (Tr. 22) that the plaintiff was able to recognize dangerous situations. In making this finding, the ALJ specifically noted that the record showed the plaintiff had good "street smarts," as Dr. Cole found when he examined the plaintiff in 2008 (Tr. 602).

Based upon the foregoing, this court finds that the ALJ's determination that the plaintiff failed to establish deficits in adaptive functioning as required for Listing 12.05(C) is based upon substantial evidence and is free of legal error.

Furthermore, the ALJ's residual functional capacity ("RFC") finding that the plaintiff could perform medium work with no concentrated exposure to fumes and no more than simple, one to two step functions not requiring contact with the public is based upon substantial evidence. The ALJ gave great weight to the opinions of Dr. Cole and the State agency physicians and limited weight to the opinion of Dr. Keith (Tr. 27-28). Dr. Cole concluded that the plaintiff was capable of learning simple tasks, focusing her attention well enough to complete a task in a timely manner, and performing work that did not require working directly with the public (Tr. 602). Similarly, State agency psychologist Dr. Clanton determined that the plaintiff could remember location and work-like procedures; carry out short, simple instructions and perform simple, routine work activities; complete tasks in a timely manner; sustain appropriate interactions with peers and co-workers; and respond appropriately to changes in a routine setting (Tr. 620). Despite the plaintiff's IQ scores of below 70 in testing he administered, Dr. Keith indicated that the plaintiff had only mild limitations in understanding, remembering, and carrying out simple instructions; making

23

simple work-related decisions; interacting appropriately with the public, supervisors, and co-workers; and responding appropriately to usual work situations and to changes in a routine work setting; and that the plaintiff would be able to complete simple tasks, follow simple directions, and perform work allowing close supervision (Tr. 665-67).

In assessing the plaintiff's credibility, the ALJ expressly noted objective physical and mental findings that were not consistent with her alleged limitations (Tr. 24-26).   The ALJ noted that despite the plaintiff's claims of debilitating back pain, medical records showed no acute findings, negative straight leg raise test, and very minimal degenerative disc disease.  The plaintiff also reported that she walked one quarter to two miles per day and felt capable of doing all manner of housework except mowing (Tr. 24). The ALJ also noted considered the plaintiff's daily activities, which included using the bus system, taking multiple medications, performing household chores, engaging in crafts, shopping, and visiting with others (Tr. 13-15, 18, 21, 25).  The ALJ also noted (Tr. 24-25) that the plaintiff declined "Disability and Special Needs" social services (Tr. 514) and did not receive significant mental health treatment. The ALJ noted (Tr. 25) that the plaintiff had been convicted of providing false information to a law officer, which also damaged her credibility (Tr. 287).   Lastly, the ALJ noted (Tr. 25-26) the plaintiff's lack of effort in Dr. Cole's 1998 intelligence testing, despite which the results of such testing were the plaintiff's highest intelligence test scores of record.  Additionally, Dr. Cole also noted in September 2008 that some information the plaintiff offered was obviously exaggerated, such as stating she had not slept in over three weeks, although she did not appear sleep deprived, and reporting that she was homeless, although she did not appear homeless and had satisfactory hygiene, a new handbag, and multiple rings in her ears and on her fingers (Tr. 600, 602).

In his RFC finding, the ALJ accounted for all of the plaintiff's impairments, both severe and non-severe, by limiting her to medium work because of her back pain,

24

limiting her exposure to fumes because of her asthma, and limiting her to the performance of simple, one to two step functions and no contact with the public due to her borderline intellectual functioning, depression, and personality disorder (Tr. 27). Further, the vocational expert testified that, considering an individual of the plaintiff's age, educational background, and past work experience, with an RFC as noted above, jobs existed in the regional and national economies such an individual could perform, in numbers the ALJ found to be significant (Tr. 59-61, 65). He cited the unskilled medium occupations of hand packager, park worker, and sandwich maker as examples (Tr. 59-61). This court finds that the ALJ's hypothetical question to the vocational expert was proper, and the expert's response constituted substantial evidence in support of the ALJ's finding at step five of the sequential evaluation.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

July 8, 2013                                          s/ Kevin F. McDonald
Greenville, South Carolina                           United States Magistrate Judge

25